THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff, v. TRUMAN L. KEYS *et al.*, Defendants-Appellees (Larry S. Mills, State's Attorney of Vermilion County, Contemnor-Appellant).—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff, v. TRUMAN L. KEYS *et al.*, Defendants-Appellees (Dan Reed, Contemnor-Appellant).

Fourth District   Nos. 4—99—0761, 4—99—0762 cons.

Argued June 13, 2000.—Opinion filed September 10, 2001.

STEIGMANN, P.J., dissenting.

Larry S. Mills, State's Attorney, of Danville (Norbert J. Goetten, Robert J. Biderman, and David E. Mannchen (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for appellant Larry S. Mills.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Mary E. Welsh (argued), Assistant Attorney General, of counsel), for appellant Dan Reed.

Robert G. Kirchner (argued), of Lerner & Kirchner, of Champaign, for appellees.

JUSTICE COOK delivered the opinion of the court:

Contemnor Larry Mills is the State's Attorney of Vermilion County. Contemnor Dan Reed is the director of the Vermilion County Metropolitan Enforcement Group (V-MEG), a police agency consisting of several cooperating Vermilion County police departments. Contemnors appeal from an August 20, 1999, order finding them to be in indirect civil contempt for their willful refusal to comply with a June 18, 1999, order directing them to return property that had been seized from defendants Truman and Carolyn Keys. The August 20, 1999, order fined each contemnor $100, but the fine was stayed pending appellate review. Contemnors appeal, arguing that the June 18, 1999, order was void, as the circuit court lacked jurisdiction to enter it. We affirm.

## I. BACKGROUND

On August 23, 1997, the circuit court issued a search warrant to V-MEG for the search of defendants' Danville residence in connection with drug charges. On August 25, 1997, the circuit court issued a seizure warrant for defendants' bank accounts, certificates of deposit, and vehicles. The seizure warrant was issued in response to the affida-

vit of an Illinois State Police inspector stating that the items were subject to forfeiture to the State of Illinois pursuant to section 505 of the Illinois Controlled Substances Act (Substances Act) (720 ILCS 570/505 (West 1996)) and the Drug Asset Forfeiture Procedure Act (Forfeiture Act) (725 ILCS 150/1 through 14 (West 1996)).

Inventories subsequently filed with the circuit court indicate that V-MEG seized approximately $9,450 and a computer from defendants' residence and approximately $30,800 from defendants' bank accounts.

On November 24, 1997, pursuant to a motion for turnover filed by Mike Clary, then State's Attorney of Vermilion County, the circuit court entered an order that United States currency in the amounts of $27,245.65, $3,649.45, and $10,006, and a Hewlett Packard Computer, serial No. US7006213, seized on or about August 23, 1997, by V-MEG, be turned over to the Federal Bureau of Investigation (FBI), Springfield, for the purpose of federal forfeiture. The order was not given a number, is not in the seizure warrant file, and was not filed with the Vermilion County clerk's office. Defendants' names do not appear on the motion or the order. Defendants had been arrested on August 23, 1997, and charged with various drug offenses, but neither they nor their attorney was given any notice of the order or its entry.

On December 5, 1997, defendants filed a motion for return of noncontraband property, arguing that the State's deadline for initiation of forfeiture proceedings had passed. 725 ILCS 150/9(A) (West 1996) ("within 45 days of the receipt of notice of seizure by the seizing agency *** , the State's Attorney shall institute judicial forfeiture proceedings"). Forty-five days after August 25 is October 9.

On December 23, 1997, the FBI sent defendant Truman Keys seven letters, certified return receipt, advising that the V-MEG seizure was adopted by the FBI on November 19, 1997, for forfeiture under federal law. To contest the seizure or forfeiture, defendant was required to file claims of ownership and bonds in the amount of $250 with the FBI by February 9, 1998. The FBI sent another letter, certified return receipt, dated December 30, 1997.

A hearing was held January 8, 1998, on defendants' motion for return of noncontraband property. At the hearing, Clary stated he had been told, that day, by defense counsel that there might be some federal involvement, but he did not have any idea whether that was going on or not. He also said that his office did not usually handle these matters, that they were handled by the appellate prosecutor's office, and that his office did not "necessarily" have a file. The trial court reserved ruling, stating that it would like more information from both sides as to where the property was, what the history of the transfer was, and if there was something being handled by the appellate prosecutor.

On April 10, 1998, the property management officer of the FBI, Washington, issued a declaration that the various assets had been administratively forfeited.

Clary testified at a hearing on June 26, 1998, that he became aware, during the week following August 23, 1997, that defendants' accounts had been seized and that those monies were being held by V-MEG. Clary obtained the turnover order on November 24 because either Steve Furman or contemnor Reed desired to have the property turned over to the FBI so that the FBI could pursue a forfeiture. Clary made a conscious decision not to provide notice of the turnover order to defendants or their attorney, even when defendants' attorney specifically asked about the status of the property. Clary stated that he did not recall having obtained the November 24 order when he discussed the matter with the court on January 8 and that is why he did not tell the court about it. He admitted that he did not make any inquiry of the appellate prosecutor's office after the January 8 hearing, but that he just contacted V-MEG.

On July 1, 1998, the circuit court entered an order finding that the State furnished no notice prior to the presentation of the November 24 turnover order, that the order was never filed of record, that the defendants were entitled to notice, and that the order "is deemed to be void *ab initio*."

In a hearing on April 30, 1999, it was determined that the computer which had been seized was being retained by V-MEG and that 80% of the monies which had purportedly been transferred to the federal government were actually being held by V-MEG, the Danville police department, and the Vermilion County State's Attorney's office. On June 18, 1999, the circuit court entered an order finding that the State failed to institute forfeiture proceedings in accordance with the statute and that no lawful authority existed for the continued retention of the property by the State and further ordering contemnors to return the property. No appeal was taken from that order. On August 20, 1999, the circuit court entered the order appealed, finding contemnors in indirect civil contempt for their failure to comply with the order of June 18, 1999.

## II. ANALYSIS

•1 Contemnors argue that, when a contempt order results from the violation of an interlocutory order, the validity of the interlocutory order may be called into question in an appeal from the order of contempt. *Busey Bank v. Salyards*, 304 Ill. App. 3d 214, 218, 711 N.E.2d 10, 14-15 (1999). The June 18, 1999, order that directed contemnors to return the property was, however, a final order. The June

18 order determined the litigation on the merits so that the only step remaining was proceeding with the execution of the judgment. *Catlett v. Novak*, 116 Ill. 2d 63, 68, 506 N.E.2d 586, 588-89 (1987). When a contempt order results from the violation of an order that was final for purposes of appeal but was not appealed, the validity of the underlying order may not be called into question in an appeal from the order of contempt. *Busey Bank*, 304 Ill. App. 3d at 218, 711 N.E.2d at 14-15. The only question is whether the underlying order is void. *Busey Bank*, 304 Ill. App. 3d at 218, 711 N.E.2d at 14-15.

●2 The procedure employed here, where state authorities turn over assets they have seized to federal authorities to seek forfeiture, is apparently employed because there is a greater chance of success under the more permissive federal forfeiture statute. *United States v. One 1979 Chevrolet C-20 Van*, 924 F.2d 120, 123 (7th Cir. 1991); see *Scarabin v. Drug Enforcement Administration*, 966 F.2d 989, 991 (5th Cir. 1992) ("shell game"). In the present case, there may have been another reason for the turnover, *i.e.*, to get around the expiration of the 45-day limitations period provided by state law. 725 ILCS 150/9(A) (West 1996). When state and federal courts each proceed against the same *res*, the court first assuming jurisdiction over the property may maintain and exercise that jurisdiction to the exclusion of the other. *One 1979 Chevrolet*, 924 F.2d at 121. A local police department may not take seized property and just pass it on as it pleases to the FBI in flagrant disregard of state laws mandating judicial authority for such turnovers. *One 1979 Chevrolet*, 924 F.2d at 122.

●3 A state forfeiture proceeding need not be pending for the state court to have jurisdiction over the *res*. *United States v. One 1987 Mercedes Benz Roadster*, 2 F.3d 241, 243 (7th Cir. 1993). *One 1979 Chevrolet* did note the fact that "[a]t the time the complaint was filed in federal district court, the state forfeiture action was pending." *One 1979 Chevrolet*, 924 F.2d at 123. It must be recognized, however, that *One 1979 Chevrolet* involved a warrantless search, and it was accordingly the forfeiture action which first brought the *res* before the court. These cases do not depend upon "who won the forfeiture 'foot race' in the courts." *One 1987 Mercedes*, 2 F.3d at 243, quoting *One 1979 Chevrolet*, 924 F.2d at 122. A turnover order from the circuit court of the county in which the *res* was seized is the appropriate method for seeking authority for a transfer from state authorities to federal authorities. *One 1987 Mercedes*, 2 F.3d at 243.

●4 Contemnors argue that the statutes have been changed since *One 1979 Chevrolet* and *One 1987 Mercedes* were decided. They refer us to section 12(d) of the Cannabis Control Act:

"(d) Property taken or detained under this [s]ection shall not be

subject to replevin, but is deemed to be in the custody of the Director [of the Department of State Police] subject only to the order and judgments of the circuit court having jurisdiction over the forfeiture proceedings *and the decisions of the State's Attorney under the [Forfeiture Act* (725 ILCS 150/1 through 14 (West 1996))].
*** *Upon receiving notice of seizure, the Director may*:

\* \* \*

(6) *provide for another agency or custodian, including an owner, secured party, or lienholder, to take custody of the property upon the terms and conditions set by the Director."* (Emphasis added.) 720 ILCS 550/12(d) (West 1996).

The emphasized language was added since the Seventh Circuit's decision in *One 1979 Chevrolet.*

Contemnors argue that it makes no difference whether the November 24 turnover order was valid, because the State's Attorney and the police may transfer the property to the FBI without any court order. We need not decide whether the emphasized language applies only to nonjudicial forfeitures (725 ILCS 150/6 (West 1996)) or to seizures such as warrantless seizures obtained without any court involvement. In any event, the emphasized language clearly does not oust the circuit court of its power to deal with assets that have come within its jurisdiction. The language remains that the property shall be deemed to be in the custody of the Director "subject only to the order and judgments of the circuit court having jurisdiction over the forfeiture proceedings." 720 ILCS 550/12(d) (West 1996).

Contemnors argue their position is supported by the decision of the United States District Court in *United States v. Sixty-Two Thousand Six Hundred Dollars*, 899 F. Supp. 378 (N.D. Ill. 1995) (*$62,600*). In *$62,600*, the court concluded that a release of the *res* that came from the executive branch (State's Attorney), rather than the judicial branch, was authorized by the emphasized changes in Illinois law. The real issue here, according to *One 1979 Chevrolet*, is the circumventing of the authority of the state court that has been dealing with the *res. One 1979 Chevrolet*, 924 F.2d at 122. Courts are rightfully jealous of their jurisdiction, and once they have assumed it they should not be considered to have surrendered it until they have expressly done so. *One 1987 Mercedes*, 2 F.3d at 243 (a turnover order from the circuit court of the county in which the *res* was seized is the appropriate method). The State's Attorney does not have the power to oust the circuit court of jurisdiction once that jurisdiction has been assumed.

We also disagree with contemnors' arguments that, as a result of the statutory changes, "Illinois courts no longer have exclusive juris-

diction over seized property" and "the courts have only concurrent jurisdiction with [S]tate's [A]ttorneys." The courts have their jurisdiction by virtue of the constitution (Ill. Const. 1970, art. VI, §§ 1, 9). The legislature could not limit the jurisdiction of the courts by these statutory changes, and a reading of the changes indicates no intention to do so. The district court read the statutory changes "to give State's Attorneys the power (concurrently with the state circuit courts) to dispose of contraband." *$62,600*, 899 F. Supp. at 379. The district court was saying only that State's Attorneys may deal with property that has not come within the jurisdiction of the court.

In any event, *$62,600* is not much like our case. In *$62,600*, the State's Attorney released the *res* to the United States; in our case, it was the circuit court which issued a turnover order. In *$62,600*, there is no indication of any state court involvement; in our case, a motion for return of noncontraband property was filed in state court on December 5, 1997, and it was not until long after that that the State's Attorney disclosed to the court that there was any federal involvement. In *$62,600*, the federal court assumed jurisdiction; in our case, the federal court did not assume jurisdiction—there was only an administrative forfeiture. Finally, neither the State's Attorney nor the FBI took any action in this case until after the 45-day limitations period expired on October 9, 1997. Clary did not seek a turnover order until November 24. The FBI's certified letters state that the V-MEG seizure was adopted by the FBI on November 19. Contrary to contemnors' arguments, state law time limits do have some effect upon a federal forfeiture action. *$62,600* recognized that the 45-day limit might be viewed as setting the outside date for some sort of action to be taken by the State's Attorney. *$62,600*, 899 F. Supp. at 379 n.2. That seems appropriate. The 45-day limit would be meaningless if the State's Attorney could do nothing for months, then avoid the limit by turning the *res* over to the FBI. In *$62,600*, the statute's time limitation was "met by the turnover to the United States on June 23—two days short of the 45-day limit." *$62,600*, 899 F. Supp. at 379 n.2.

Contemnors argue that the trial court did not "assume sole jurisdiction over the property by virtue of its seizure." That statement recognizes that the trial court had some jurisdiction over the property by virtue of its seizure. Again, it is not necessary that state *forfeiture* proceedings actually be instituted before there will be a "circuit court having jurisdiction over forfeiture proceedings." *One 1987 Mercedes*, 2 F.3d at 243 (the holding of *One 1979 Chevrolet* "does not depend on the existence of a competing state forfeiture proceeding"). The assets in this case came within the power of the circuit court when the court issued a warrant for their seizure and when they were inventoried in

the court. The State's Attorney recognized the circuit court's power over these assets when he applied to the circuit court for a turnover order. The State's Attorney did not have the right to accept the jurisdiction of the circuit court while he agreed with its rulings, but then ignore that jurisdiction when the court began asking questions.

Contemnors argue that even if the property was within the jurisdiction of the circuit court, and even if the November 24, 1997, turnover order was void *ab initio*, the fact of the matter is that there has now been a federal administrative forfeiture. Contemnors argue that the federal administrative forfeiture may not be collaterally attacked in state court. Contemnors are mistaken that we may ignore what occurred before the federal administrative forfeiture was declared. Just as an individual may not be kidnapped in one state and dragged across state lines to be subjected to jurisdiction in another state, the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the other. "Jurisdiction obtained by mere possession 'goes much too far.' " *One 1979 Chevrolet*, 924 F.2d at 123, quoting *United States v. $79,123.49 in U.S. Cash & Currency*, 830 F.2d 94, 98 (7th Cir. 1987). " 'Possession obtained through an invalid seizure neither strips the first court of jurisdiction nor vests it in the second.' " *One 1979 Chevrolet*, 924 F.2d at 123, quoting *$79,123.49*, 830 F.2d at 98.

Contemnors argue that the trial court's orders in this case were void, because they violated section 9(J) of the Forfeiture Act, which provides:

"An acquittal or dismissal in a criminal proceeding shall not preclude civil proceedings under this [Forfeiture] Act; however, for good cause shown, on a motion by the State's Attorney, the court may stay civil forfeiture proceedings during the criminal trial for a related criminal indictment or information alleging a violation of the [Substances Act] or the Cannabis Control Act. Such a stay shall not be available pending an appeal. Property subject to forfeiture under the [Substances Act] or the Cannabis Control Act shall not be subject to return or release by a court exercising jurisdiction over a criminal case involving the seizure of such property unless such return or release is consented to by the State's Attorney." 725 ILCS 150/9(J) (West 1996).

This provision was intended to prevent the release of property until such time as the procedures set forth in the Forfeiture Act have been followed. The trial court recognized that it could not deal with the assets here as a part of the criminal proceeding and that it had to make its determination in accordance with the forfeiture statutes. It did so.

Contemnors argue that they refused to comply with the trial

court's order in a good-faith attempt to obtain review of the trial court's order. They argue that they do not have the property in their possession and that it is impossible for them to comply with the trial court's order. We are confident that, now that we have upheld the trial court's order, the contemnors will act appropriately in attempting to comply with it and the trial court will take those actions into consideration.

The dissent suggests that contemnor Reed was not given notice of the motion for return of noncontraband property or of the June or July 1999 hearing. There is no indication, however, that defendants knew of Reed's involvement when they filed their motion. The motion involved an *in rem* proceeding where jurisdiction over particular individuals was not necessary, only jurisdiction over the property. We should not tolerate a situation where individuals who have been served transfer property to other individuals and then complain there has been no service of process on those other individuals. Even assuming Reed was a necessary party, his interests were clearly represented by the State's Attorney, with whom he was in privity. In enforcing a turn-over order, the court may order the person or entity holding the property to turn it over without giving that person or entity any advance notice. A common example is an order served on a bank, directing it to turn over the funds of a particular depositor.

## III. CONCLUSION

We have considered all the arguments raised by the parties and nevertheless conclude that the trial court had jurisdiction to enter its order of June 18, 1999, directing the return of the assets. No appeal was taken from that order. For the foregoing reasons, we affirm the August 20, 1999, order finding contemnors to be in indirect civil contempt.

Affirmed.

MYERSCOUGH, J., concurs.

PRESIDING JUSTICE STEIGMANN, dissenting:

The contemnors as appellants raised several issues in their attack on the trial court's finding them in indirect civil contempt of court, and this is one of those rare cases where—in my judgment—the appellants are correct across the board. Accordingly, I respectfully dissent.

Contemnors are correct when they argue that because the trial court lacked *in rem* jurisdiction when it entered the order directing them to return the seized property to defendants, that order is void.

In a 1991 amendment (Pub. Act 87—614, § 4, eff. September 18, 1991 (1991 Ill. Laws 3061, 3067-68)) to section 505 of the Substances Act (720 ILCS 570/505(d) (West 1996)), the General Assembly gave State's Attorneys the power (concurrent with the state circuit courts) to turn property subject to forfeiture over to other agencies. *$62,600*, 899 F. Supp. 378. Thus, the State was acting within its authority when it sought the trial court's permission to turn the seized property over to federal law enforcement authorities for federal forfeiture proceedings. Once the turnover order was entered, the FBI had the authority to initiate federal forfeiture proceedings, which it did. The court's later order voiding its turnover order could not divest the federal authorities of *in rem* jurisdiction over the property seized from defendants.

Defendants argue that the trial court retained jurisdiction over the property because the court (1) authorized the search and seizure warrants under which the property was seized, and (2) was still presiding over defendants' criminal trial. Defendants are wrong. The court's continued jurisdiction over defendants' criminal trial is inapposite to whether it has *in rem* jurisdiction over the property subject to forfeiture. In short, the court lost jurisdiction when the property was turned over to the federal authorities, and the court's subsequent efforts to exercise jurisdiction over the property are void.

Defendants also argue that the turnover order was entered in violation of their due process rights—namely, their right to be notified of proceedings pertaining to their property. I disagree.

Defendants had the opportunity to avail themselves of all of the process that they were due. They were notified of the commencement of federal administrative forfeiture proceedings and of their right to contest the seizure and claim their property in federal court. The motions defendants filed in the trial court constituted a collateral attack on the federal forfeiture proceedings and were thus improper.

Defendants characterize the State's conduct (filing the motion for turnover *ex parte*) as surreptitious and underhanded, and the majority appears to agree. However, the record does not support that inference or the conclusion that either the State's motion or the trial court's *ex parte* order was improper. Defendants are generally not entitled to advance notice of prosecutorial decisions. Moreover, the State routinely seeks certain court orders *ex parte*, and trial courts have the authority to enter orders pertaining to the seizure of property and its custody without notifying the property owners. See, *e.g.*, 725 ILCS 5/108—11 (West 1996) (requiring the court to enter an order providing for the custody of property seized pursuant to a search warrant pending further proceedings). Sections 108—10 and 108—11 of the Code of Criminal Procedure of 1963 (Code) require (1) a return to be made to the

court of an inventory of seized property, and (2) that the court (a) enter an order providing for the custody of those items and (b) upon request deliver a copy of the inventory to the person from whose premises the property was seized. 725 ILCS 5/108—10, 108—11 (West 1996). Considering the hundreds of search warrants that are executed annually in Illinois, it is noteworthy that no case in the 38-year history of the Code has ever held that property owners are entitled to a hearing prior to the court's entry of such an order.

Because the previous discussion is sufficient to show that the trial court's rulings are erroneous and should be reversed, I need not discuss contemnors' additional arguments.

One additional aspect of this case warrants mentioning. Defendants criticize contemnor Reed for not filing a timely notice of appeal from the return order. However, the record shows that defendants did not serve contemnor Reed with their motions for the return of noncontraband and seized property, nor did they serve him with notice of the June or July 1999 hearing. In this regard, I agree with contemnor Reed, who asserts as follows:

"Moreover, even though [d]efendants had not joined [c]ontemnor Reed as a party, and even though he did not appear either in person or through his own counsel at the June 8, 1998[,] hearing, they drafted an order directing him *individually* as well as in his official capacity as V-MEG Director to return the property. Given their own due process challenge to the [turnover] [o]rder, it is no small irony that [d]efendants now fault [c]ontemnor Reed for not filing a timely notice of appeal from an order entered at a hearing of which he had no prior notice and at which he had no opportunity to be heard. Worse yet, [d]efendants offer no authority whatsoever for their assumption that [c]ontemnor Reed, a non[ ]party, even *could* have appealed from the order." (Emphasis in original.)